**UNITED STATES DISTRICT COURT          EASTERN DISTRICT OF TEXAS**

IGALIOUS (IKE) MILLS,                    §
                                         §
                    Plaintiff,           §
                                         §
*versus*                                 §     CIVIL ACTION NO. 1:05-CV-298
                                         §
CITY OF PORT ARTHUR, TEXAS, and          §
CITY OF PORT ARTHUR ECONOMIC             §
DEVELOPMENT SECTION 4A                    §
CORPORATION,                             §
                                         §
                    Defendants.          §

## MEMORANDUM AND ORDER

Pending before the court is Defendant City of Port Arthur, Texas's ("the City") and City of Port Arthur Economic Development Section 4A Corporation's ("EDC") Motion for Summary Judgment (#21).  Defendants seek summary judgment on Plaintiff Igalious "Ike" Mills's ("Mills") action alleging racial discrimination and retaliation in employment arising under the Civil Rights Act of 1871, 42 U.S.C. § 1983, through which he seeks to vindicate rights protected by the Civil Rights Act of 1866, 42 U.S.C. § 1981.  Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

I.     Background

Mills, an African American, was employed as the Executive Director of the EDC from June 2002 until February 8, 2005, when the City Council of Port Arthur ("City Council") voted to eliminate his position.  The City Council is composed of the Mayor of Port Arthur and eight council members, one of whom is designated as Mayor Pro Tem.  Mills began his career at the

EDC as a deputy to the first Executive Director, David Foster ("Foster"), a Caucasian. Following Foster's voluntary departure, Mills served as the Interim Executive Director of the EDC from November 2001 until June 2002, when Mills was named the Executive Director of the EDC. Three members of the City Council opposed his permanent appointment as Executive Director.

Before accepting employment with the EDC, Mills served as a financial planner for the City of Port Arthur for several years. The City Council resolution authorizing the hiring of Mills as Deputy Director for the period October 1, 1997, through October 1, 1998, specifically provided that, should the funding for his position be eliminated, Mills was to return to the City to resume his employment.

Although Foster was allegedly paid $89,000.00 annually, the City offered Mills a less attractive compensation package following the City Council's June 2002 vote to appoint him as Executive Director. Upset by the difference between his proposed salary and the compensation paid to Foster, Mills refused the City's initial offer and filed a racial discrimination lawsuit against the City and the EDC on October 7, 2003, in the 172d Judicial District Court of Jefferson County, Texas. During this period, Mills assumed the duties of Executive Director, but he was paid the same salary that he received in his former position as Deputy Director. On November 25, 2003, Mills settled his lawsuit, entering into an agreement with the City under which his compensation was fixed at Range 57, Grade 6, amounting to an annual salary of $63,833.00, plus back pay of $26,060.00 and attorney's fees of $21,439.04. Although the record is unclear, Mills acknowledged in his response to the summary judgment motion that this settlement provided him the same salary that was originally offered him by the City when he became Executive Director. The decision by the City Council to settle with Mills was reportedly contentious.

2

The EDC was formed pursuant to the Development Corporation Act of 1979, TEX. REV. CIV. STAT. ANN. art. 5190.6 (Vernon Supp. 2006), to encourage economic development and provide job opportunities in the Port Arthur area. As Executive Director, Mills was responsible for overseeing the daily operation of the EDC, developing and implementing economic development programs and projects, creating programs to provide employment, ensuring access to job training in the community, engaging in strategic economic development planning, coordinating economic development initiatives with local, state, and national officials, dealing with relevant legislative issues, and working with local entities to encourage economic development. Although its Board of Directors ("Board") had ultimate authority over the EDC, Mills conducted its day-to-day operations, supervised employees, provided Board members with information concerning the EDC's activities, and helped set the agenda for Board meetings. Mills was responsible for "overseeing all administrative functions of the [EDC]."

Under the EDC's operating policy, "clients" must apply to have a "project" funded by the EDC. The Executive Director, or now Chief Executive Officer ("CEO"), performs due diligence before putting an item on the agenda of the Board. If a project is approved by the Board, it is passed along to the City Council for final approval. According to Mills, if the City Council determines that changes are necessary, the project must be reconfirmed by the Board. Occasionally, however, City employees directly initiate negotiations with businesses. Also, Oscar Ortiz ("Ortiz"), the Mayor of Port Arthur, claims to have been repeatedly contacted by clients when Mills failed to communicate with them in a timely manner. The EDC is responsible for ensuring compliance with the dictates of any resulting contracts.

Mills's qualifications for the post of Executive Director were disputed from the outset. The initial vote in June 2002 to approve Mills as the Executive Director was opposed by three individuals, then-Mayor Pro Tem Tom Henderson ("Henderson"), a Caucasian, and Council Members Felix Barker ("Barker"), a Caucasian, and Bob Bowers, a Caucasian.  Despite Mills's allegations of long-term animosity, Ortiz, a Hispanic, did not vote against approving the contract. Opponents of Mills's appointment purportedly argued that he did not have adequate qualifications for the position, particularly emphasizing his alleged inability to write well.

Mills repeatedly clashed with Ortiz in the course of his duties as Executive Director.  Ortiz initiated negotiations to bring a Target retail store to Port Arthur.  On multiple occasions, Ortiz informally urged Mills to put the project on the EDC's agenda.  Mark Sokolow ("Sokolow"), the City Attorney, sent Mills a draft of the proposed contract.  Although Mills described the Target initiative as a "good project," he expressed concerns that he had been excluded from the negotiation process.  At deposition, he claimed, allegedly based on advice from a representative of the Office of the Attorney General of Texas, that a grant of $300,000.00 in funds had to be tied to "something in the project," such as "land, building[s], [or] equipment[,]" for fear that an unrestricted disbursement could "[lend] itself to criminal activity."  Purportedly because of these reservations, Mills never placed the Target project on the EDC agenda.  Ultimately, the initiative was approved after Sokolow presented it directly to the Board, bypassing Mills.  By that time, however, state law had changed to preclude the EDC from funding the Target project as planned. Ortiz blamed Mills for the delay.  Mills alleges that Ortiz threatened to fire him for failing to present the Target project to the Board in a prompt manner.

Ortiz and Mills's relationship further deteriorated over the Team Industry Texas ("Team") project.  Ortiz was part of the negotiating team to bring a manufacturing facility to Port Arthur.  While Mills participated to some extent, he indicated at deposition that he was not party to all the negotiations.  Although Mills described it as "an ideal-type project," the EDC never approved it, and Port Arthur lost the project to another city.  Mills explained at deposition that Team never supplied sufficient information to the EDC for approval, as it failed to include a precise dollar amount in its application.  Ortiz allegedly screamed at Mills when he feared that Port Arthur might lose the project, telling him that he would be fired should the project be lost to another location.  Ortiz supposedly told Mills, "You just need to get it done . . . . [W]e can't afford to lose this project to Houston."  Mills acknowledges that it was his responsibility to obtain the requisite information concerning proposals, but he claims to have contacted Team's representative and Anthony Valentine, a local union official, to ascertain a dollar figure for the project, which proved unavailing.  Approximately six months after the initial application, the project was dropped due to Team's failure to supply complete information.  Again, Ortiz blamed Mills for failing to bring the manufacturing facility to Port Arthur.

Mills also allegedly mishandled a situation where a contractor improperly installed a water line in place of an electrical conduit.  Relying in part of the advice of Bill Diamond ("Diamond"), the project manager, Mills chose to use $63,000.00 in credit, which was designated for the installation of three electrical cabinets, to correct the error.  Mills never sent a demand letter to the contractor for the $63,000.00 or otherwise attempted to recoup the EDC's losses, choosing to rely on his project manager to resolve the situation.  At deposition, Mills suggested that the money could have been recovered at a later date and that his first responsibility was to complete

the project under budget, rather than to ensure that the full complement of electrical cabinets was installed.

On another occasion, Mills issued a final payment to the Port Arthur Redevelopment Initiative prior to receiving a final report.  Mills conceded that the payment was a "concern" and an "oversight."  Mills attributed the premature payment to understaffing, asserting that it "fell through the cracks."  At deposition, he also placed some of the blame for this mistake on Becky Underhill ("Underhill"), the City Secretary, for issuing the check.  Mills admitted, however, that he authorized the payment and that Underhill would not have issued the check absent his request. Moreover, Mills acknowledged that Underhill was not obligated to check the progress of a project—rather, Underhill's responsibilities were limited to ensuring that the funds in question were issued pursuant to a valid City Council resolution.

Ortiz expressed the opinion that Mills violated state law during his tenure as Executive Director.  Mills allegedly purchased $14,000.00 worth of furniture, which he billed to the City, despite having a statutory limit on his discretionary purchases of $5,000.00.  The City Council paid the bill so as not to anger the local merchant.  Ortiz indicated that this incident was representative of Mills's behavior.  While Ortiz allegedly requested that the district attorney investigate Mills's purportedly illegal behavior and supposedly suggested publicly that Mills would be indicted, he was never indicted.  Mills explained at deposition that he believed the $5,000.00 limit referred only to discrete purchases, and that no individual piece of furniture crossed this threshold.

Although the EDC Board did not terminate Mills for his conduct, it considered placing him on probation.  Mills resented these discussions, contending that he was not provided adequate

standards by which his performance could be measured and that Foster experienced more favorable treatment.  Ultimately, Mills was not placed on probation, a fact he attributes to the evaluation process not being completed.  In any event, Mills was subjected to no adverse action as a result of these discussions.

While the City never received a formal review of Mills's job performance, annual audits of the EDC were furnished to the City Council.  Three such audit reports, authored by Gayle W. Botley & Associates ("Botley"), dated March 17, 2003, January 9, 2004, and January 14, 2005, were submitted to the court.  Though the parties disagree about the proper interpretation of these reports and the corresponding allocation of fault, these audits were largely critical of both the operation of the EDC and the City Council's supervision of it.  The 2003 Botley report emphasized the need for the creation of a more "favorable control environment," improvements in the "grant/loan application process" and "economic incentive contracts," and increased monitoring of award and loan recipients.  The report also criticized the EDC for failing to supply data for the audit in a timely manner.

The 2004 Botley report reflected that substantial improvements were not made concerning several of the previously identified problem areas.  Moreover, the audit listed a number of specific deficiencies, namely:

1.   A final payment was disbursed on April 25, 2003, though the relevant contractual obligations had not been fulfilled.

2.   A final payment was not disbursed in accordance with the terms of a contract, as no evidence in support of the actual expenses was presented to the EDC.

3.   The EDC paid an invoice, dated January 22, 2003, noting additional services, amounting to $22,000.00, that were not authorized.

4.     Consultants rendered another invoice for $24,020.00, dated December 19, 2004, for the same unauthorized additional work.

5.     Certain consultants did not provide audits of their firms as required by the contractual agreements.

Once again, Botley chastised the EDC for failing to supply adequate information to complete the audit properly.   The report was also critical of the confrontational relationship and lack of cooperation between the EDC and the City Council.

In 2005, Botley noted several "repeat items" of concern, for which "different actions [were] required to cause positive results."   Botley pointed to the continued improper administration of several EDC contracts, emphasizing that:

1.     The EDC agreed to and accepted work from third parties before the City Council approved the relevant contracts.

2.     On at least one occasion, the EDC executed a contract that included terms that did not correspond to the contract-related resolution passed by the City Council.

3.     The EDC paid certain bills before the City Council approved the underlying contracts.

4.     The EDC failed to manage contracts in a manner designed to maintain the budget discipline approved by the City Council.

Botley recommended that the "Council take the necessary action to [ensure] contracts are executed according to the terms [it] approves."   Once again, the report indicated that the EDC failed to provide pertinent information to the auditors.   In contrast, the report praised the "City Management" for its "steady progress" in response to certain concerns previously raised by Botley, singling out Underhill for her "support and assistance" during the audit.

Ortiz suggested at deposition that Mills's failure to abide by proper protocols subjected the City to potentially costly lawsuits and likewise jeopardized the City's bond rating.   While Ortiz

8

could not point to any suits filed against the City as a result of Mills's mismanagement, he recollected that Port Arthur was involved in litigation with Diamond, the former EDC project manager, and a North Carolina company stemming from Mills's lack of proper oversight of the EDC's activities.  Ortiz testified that Mills's failure to provide adequate information for the audits could have caused the State to issue a negative report, which would have downgraded the City's bond rating.  Though Port Arthur's bond rating did not suffer during Mills's tenure, Ortiz believed that it dropped from an "A+" to an "A" shortly after his departure.  Ortiz indicated that had the EDC failed to provide financial reports to its auditors for a third consecutive year, the City would have "lost a tremendous amount of money not only in [state] grants, but [also] in [its] bond rating, which would have had a tremendous impact in [its interest] rate."  Ortiz believed that the City's interest rates could have jumped from 4% to 5.5%, if the financial reports had not been properly filed.

On February 8, 2005, the City Council voted 5-4 in favor of Resolution Number 05-051, which eliminated Mills's position with the EDC.  Though Mills was never technically terminated, Ortiz conceded that the City Council expected the act to end Mills's employment.  Ortiz, who proposed the resolution, and Council Members Craig Hannah ("Hannah"), an African American, Barker, Henderson, and Ronnie Thompson ("Thompson"), a Caucasian, voted in favor of abolishing the position of Executive Director.  Mayor Pro Tem John Beard ("Beard") and Council Members Martin Flood ("Flood"), Dolores Prince ("Prince"), and Michael Sinegal ("Sinegal") voted against the resolution; all four council members who opposed the resolution are African American.

Ortiz explained at deposition that he and the City Council as a whole voted to eliminate the position of Executive Director because of Mills's incompetence and inability to operate the EDC "in a manner . . . [that] was efficient and profitable to the City."  While much of the discussion concerning the resolution occurred in executive session, the transcripts of which are not available to the court, the text of Resolution Number 05-051 attributes the City Council's decision to its concern regarding the Botley reports and the need for "efficient coordination and management of incentive projects and programs between the City of Port Arthur and the [EDC]."  Mills and his supporters, however, cast the discussion in a different light.  Mills argues that the City Council's vote to eliminate his position was based on racial discrimination and retaliation for his prior lawsuit against the City.  As evidence, he offers the testimony of Council Members Flood, Sinegal, and Gillam.

Flood stated at deposition that Ortiz's concerns about Mills's performance were not valid. He characterized the City Council meeting at which the Executive Director position was eliminated as a "modern-day lynching."  Flood also related anecdotes involving dishonest or otherwise inappropriate conduct by Ortiz as part of his purportedly longstanding plot to fire Mills.  When asked about Ortiz's motives, however, Flood replied that Ortiz "did not like Mr. Mills and . . . he didn't feel that Mr. Mills was capable of doing the job."  Flood did not attribute Ortiz's actions to racism or legally cognizable retaliation.  He alleged, however, that Hannah, in a context unrelated to Mills's employment, away from the City Council meeting, used the word "nigger," stated that African Americans were "incapable of running Port Arthur," and that African Americans should "do what [they are] being told to do."  Flood also testified that other individuals present at the City Council meeting made racist remarks, though they lacked votes.

10

Moreover, Flood testified that a representative of the Texas Attorney General's Office informed Flood, Gillam, and Prince that "it would be a risk to remove [the Executive Director]" unless the position was not reinstated for at least twelve months, as the EDC is supposed to be "operate[d] independently from the City." The Attorney General representative allegedly indicated that he had spoken with Sokolow about the matter; Flood also claimed that Sokolow acknowledged having spoken with a representative of the Attorney General. Flood further stated that "a couple" of EDC Board members informed him that the selection of Floyd Batiste ("Batiste"), an African American, to "replace" Mills was intended to "avoid a discrimination lawsuit." Flood recollected that Sokolow advised him that he believed the EDC Board was motivated to hire Baptiste for this reason.

Sinegal indicated that he opposed the elimination of the Executive Director position because he did not believe Mills had been adequately evaluated. Sinegal allegedly engaged in an incendiary confrontation with Ortiz, part of which was captured by the local media, in which the mayor purportedly instructed him to represent the City's interests, rather than those of Mills. Sinegal stated at deposition that Ortiz informed him that he "[had] enough money to tie Mr. Mills' ass up in court until hell freezes over." Sinegal claimed to have informed the mayor, "[I]t's not your goddamn money, it's the citizens' money. It's the taxpayers' money." He acknowledged, however, that he had never heard Ortiz use any form of racial epithet. While Sinegal recollected hearing Hannah state, "[N]iggers are not capable of running Port Arthur," he admitted the statement was not connected to Mills. Sinegal believes that the Botley reports were biased and manufactured to fit Ortiz's needs, but he conceded that he knew of no facts to impugn Gayle Botley's ("Mr. Botley") integrity. Sinegal testified that he believed Mills would have done a

better job had he not been so closely scrutinized—and that Foster did not suffer the same intense examination.  He rejected the proposition that the four African-American council members who voted against Resolution Number 05-51 were "protecting Mills."  He characterized their actions as "protecting the City" and stated that "the mayor is a lie [*sic*]" for suggesting otherwise.

Sinegal refused to attribute Mills's termination to racial discrimination.  He conjectured, however, that the situation had racial overtones and that race might have been a factor used to assist in bringing Mills down.  According to Sinegal, Ortiz resented Mills for his actions related to the Target project and other situations in which Mills defied the mayor.  Sinegal implicated Beard as having a role in bringing the vote on the resolution to passage, despite the fact that Beard formally voted against it.  Sinegal portrayed Beard's actions as motivated by ambition and the result of Ortiz's skillful political machinations.  Finally, Sinegal remembered being informed by Zendia Thomas, a representative of the Texas Attorney General's Office, that any action to "fire" Mills should first be approved by the EDC Board.  He could not recall any suggestion that Batiste was hired to "thwart a discrimination suit."

At deposition, Gillam pontificated about the existence of a wide-ranging, racially motivated conspiracy by various individuals to bring down Mills, as well as other prominent African Americans in the region.  He testified that Mills was widely recognized as one of the most distinguished business developers in Texas.  Gillam rejected the notion that Mills was not sufficiently intelligent, educated, or qualified because of his poor writing skills, stating that his staff should have performed such tasks as writing letters.  Gillam also claimed that Mills suffered from a disloyal, backstabbing staff at the EDC.

12

Following Mills's departure, Deborah Echols ("Echols"), a black, female, certified public accountant in Port Arthur's Financial Department, assumed the responsibility of supervising the EDC.  Ortiz indicated that her primary task was to clean up the records of the EDC, which Ortiz described as a "total shambles."  After Hurricane Rita, Echols's full attention was needed by the City, so she was replaced by Jana Barnes, an assistant at the EDC, likewise on an interim basis.

On November 22, 2005, the City Council passed a resolution approving the hiring of Batiste as CEO of the EDC on a permanent basis to fill Mills's former position.  It is undisputed that there is no distinction, other than nomenclature, between the CEO position and that of Executive Director, which Mills held.  Mills filed this action on April 14, 2005, alleging claims of racial discrimination and retaliation under § 1983.

II.   Analysis

A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir.

2005); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

"A fact is '*material*' if it '*might affect* the outcome of the suit under governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248); *see Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471; *Merritt-Campbell, Inc.*, 164 F.3d at 961. The moving parties, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322 n.3 (citing Fed. R. Civ. P. 56(e)); *Anderson*, 477 U.S. at 256; *Matsushita Elec. Indus. Co. v. Zenith*

14

*Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).   "[T]he court must review the record 'taken as a whole.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005).   All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996); *see Reeves*, 530 U.S. at 150; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith*, 391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.*, 261 F.3d at 471; *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001).   The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor.  *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n.5 (1990) (citing *Anderson*, 477 U.S. at 255); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003); *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815 (2003); *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).   The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th

Cir. 1999); *accord Boudreaux*, 402 F.3d at 540; *Little*, 37 F.3d at 1075 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Furthermore, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989)).  "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in his favor, and summary judgment should be granted." *Id.* at 468-69. The nonmovant's burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions," by speculation, by the mere existence of some alleged factual dispute, or "by only a scintilla of evidence."  *Little*, 37 F.3d at 1075 (citations omitted); *see Anderson*, 477 U.S. at 247-48; *Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996).  "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 332 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bear the burden of proof at trial.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).  "In such a

16

situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

B.    Alter Ego

In his response, Mills argues that the EDC should be deemed the alter ego of the City, rendering it responsible for potential liability otherwise attributable solely to the City. "A bedrock principle of corporate law is that 'a parent [entity] . . . is not liable' for actions taken by its subsidiaries." *Bridas S.A.P.I.C. v. Government of Turkmenistan* (*Bridas II*), 447 F.3d 411, 416 (5th Cir. 2006), *cert. denied*, 75 U.S.L.W. 3094 (2006) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).   Courts should "apply the alter ego doctrine and hold a parent liable for the actions of its instrumentality in the name of equity when the corporate form is used as a 'sham to perpetrate a fraud.'" *Id.* (quoting *Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1132 (5th Cir. 1988)).   "The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases." *Id.* (citing *In re Multiponics, Inc.*, 622 F.2d 709, 724-25 (5th Cir. 1980)); *accord Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).   "The doctrine applies only if '(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *Bridas II*, 447 F.3d at 416 (quoting *Bridas S.A.P.I.C. v. Government of Turkmenistan* (*Bridas I*), 345 F.3d 347, 359 (5th Cir. 2003), *cert. denied*, 541 U.S. 937 (2004)); *accord First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983).   Likewise, a determination that a corporation is an alter ego of a parent entity permits "reverse veil piercing," as sought here. *Chao v. Occupational Safety & Health Review*

17

*Comm'n*, 401 F.3d 355, 364 (5th Cir. 2005) (citing *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991)).

In this instance, it is undisputed that the City exercised complete control over the EDC with respect to the transaction at issue. Mills has failed, however, to show that such control was used to commit a fraud or wrong in this situation. *See Bridas II*, 447 F.3d at 416-17; *see also First Nat'l City Bank*, 462 U.S. at 632. The fraud or wrong in question must be "based on misuse of the corporate organizational form"—a generic allegation of wrongdoing is insufficient. *Bridas II*, 447 F.3d at 417. Here, Mills has made no showing that he suffered any particular harm intrinsic to the City's purported misuse of EDC's corporate form. He has not alleged that the City, standing alone, would be unable to satisfy a potential award of damages and thereby avoid liability. *See id.*; *see also First Nat'l City Bank*, 462 U.S. at 632. Thus, because Mills has not identified any unique harm specifically stemming from the City's alleged failure to observe corporate formalities, piercing the corporate veil under the alter ego theory is not appropriate in this case. *See Bridas II*, 447 F.3d at 417. The EDC, of course, remains liable for any acts of discrimination or retaliation that it perpetrated.

C.    Section 1983

The Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a private right of action for redressing the violation of federal law by those acting under color of state law. *See Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty.*, 538 U.S. 701, 708 (2003); *Conn v. Gabbert*, 526 U.S. 286, 290 (1999); *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994); *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the

> United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879-80 (5th Cir. 2004); *Felton v. Polles*, 315 F.3d 470, 479 (5th Cir. 2002); *Jackson v. City of Atlanta*, 73 F.3d 60, 63 (5th Cir.), *cert. denied*, 519 U.S. 818 (1996).

There are three elements to establish liability in a § 1983 action.  *See Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citing *Bush v. Viterna*, 795 F.2d 1203, 1209 (5th Cir. 1986)).  To prevail, the plaintiff must show "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor."  *Id.*; *see American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *Priester v. Lowndes County*, 354 F.3d 414, 420 (5th Cir.), *cert. denied*, 543 U.S. 829 (2004).  A § 1983 complainant must support his claim with specific facts demonstrating a deprivation of his federally protected rights and may not simply rely on conclusory allegations.  *See id.*; *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).

Thus, for Mills to recover, he must show that Defendants deprived him of a right guaranteed by the Constitution or the laws of the United States.  *See Daniels*, 474 U.S. at 329-31; *Baker*, 443 U.S. at 139; *Hernandez*, 380 F.3d at 879-80; *Victoria W.*, 369 F.3d at 482;

*Rosborough v. Management & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003). "[T]he first

step in a § 1983 analysis is to identify the specific constitutional [or federal] right involved."

*Oliver v. Scott*, 276 F.3d 736, 744 n.10 (5th Cir. 2002) (citing *Baker*, 443 U.S. at 140).[1]

"'Section 1983 imposes liability for violations of rights protected by the Constitution [or federal

statutory law], not for violations of duties of care arising out of tort law.'" *Victoria W.*, 369 F.3d

at 482 (quoting *Baker*, 443 U.S. at 146); *accord Town of Castle Rock v. Gonzales*, 545 U.S. 748,

___, 125 S. Ct. 2796, 2810 n.15 (2005); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443,

450 (5th Cir.), *cert. denied*, 513 U.S. 815 (1994).  The negligent deprivation of life, liberty, or

property does not give rise to liability under the Act.  *See McClendon v. City of Columbia*, 305

F.3d 314, 326 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232 (2003); *Campbell v. City of San

Antonio*, 43 F.3d 973, 977 (5th Cir. 1995); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th

Cir.), *cert. denied*, 506 U.S. 973 (1992).

## 1.    Racial Discrimination

Here, Mills alleges that Defendants violated his right to be free of racial discrimination

under § 1981.  "Section 1981 provides that all persons in the United States shall have the same

contractual rights as 'white citizens.'" *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th

Cir. 1996) (citing 42 U.S.C. § 1981(a)).  More specifically, § 1981 states that every person in the

United States shall have the same rights as white citizens regarding "the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and

conditions of the contractual relationship."  42 U.S.C. § 1981(b); *see Domino's Pizza, Inc. v.*

---

[1] Defendants limited their summary judgment motion to this initial inquiry.  Thus, the court will assume *arguendo* for summary judgment purposes that Mills can satisfy the second and third elements of a § 1983 analysis.

*McDonald*, ___ U.S. ___, ___, 126 S. Ct. 1246, 1249 (2006); *Arguello v. Conoco, Inc.*, 330 F.3d 355, 359 (5th Cir.), *cert. denied*, 540 U.S. 1035 (2003); *Felton*, 315 F.3d at 479-80; *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1049 (5th Cir. 1998).  Section 1981 further provides that these rights "are protected against impairment by nongovernmental discrimination and impairment under color of State law."  42 U.S.C. § 1981(c); *see Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 n.2 (2004); *Felton*, 315 F.3d at 480.

Congress initially enacted § 1981 as part of the Civil Rights Act of 1866 pursuant to § 2 of the Thirteenth Amendment.  *See Edwards v. Jewish Hosp. of St. Louis*, 855 F.2d 1345, 1348 (8th Cir. 1988).  Section 1981 was amended by the Civil Rights Act of 1991, which added subsections (b) and (c).  *See Felton*, 315 F.3d at 480; *accord Foley v. University of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2003).  This statutory amendment was "'designed to restore and strengthen civil rights laws that ban discrimination in employment.'"  *Fadeyi*, 160 F.3d at 1050 (quoting H.R. Rep. No. 102-40(II), at 2 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 694, 694).  "As a general matter, section 1981 serves as a deterrent to employment discrimination and a means of punishing employers who discriminate on the basis of race.  Section 1981 also provides a means of compensating a victim of racial discrimination."  *Carroll v. General Accident Ins. Co. of Am.*, 891 F.2d 1174, 1176 (5th Cir. 1990).

Discrimination under § 1981 can be established through either direct or circumstantial evidence.  *See Johnson v. Johnson*, 385 F.3d 503, 531 (5th Cir. 2004); *accord Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002)); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.

2000); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).  "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'"  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995))); *accord Jones*, 427 F.3d at 992.  "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)."  *Russell*, 235 F.3d at 222; *see Reeves*, 530 U.S. at 142-43; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir.), *cert. denied*, 126 S. Ct. 798 (2005); *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004); *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 384.  "Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."  *LaPierre*, 86 F.3d at 448 n.2; *accord Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Jones*, 427 F.3d at 992; *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004); *Bryan*, 375 F.3d at 360; *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999).  Likewise, discrimination claims brought pursuant to § 1983 for violations of rights under § 1981 are analyzed in the same manner as Title VII and freestanding § 1981 claims. *See Davis*, 383 F.3d at 316; *Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001), *cert. denied*, 540 U.S. 1005 (2003).

Where, as here, there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Reeves*, 530 U.S. at 142-43; *Laxton*, 333 F.3d at 578; *Russell*, 235 F.3d at 222; *Wallace*, 80 F.3d at 1047 (citing *Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995)); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir. 1994) (citing *Burdine*, 450 U.S. at 252-53). "'To establish a *prima facie* case, a plaintiff need only make a very minimal showing.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)); *accord Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999).

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003); *Reeves*, 530 U.S. at 142; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006); *Baker v. American Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir. 2005); *Hockman*, 407 F.3d at 330; *Laxton*, 333 F.3d at 578 (citing *Methodist Hosp. Sys.*, 271 F.3d at 219); *West*, 330 F.3d at 384 (citing *Russell*, 235 F.3d at 222); *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)); *see West*, 330 F.3d at 384-85; *Sandstad*, 309 F.3d at 898; *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000). "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if*

23

*believed by the trier of fact*,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer*, 169 F.3d at 966 (quoting *Hicks*, 509 U.S. at 507) (emphasis in original); *accord Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000).

If the employer meets its burden, "'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*.'" *Reeves*, 530 U.S. at 142-43 (quoting *Hicks*, 509 U.S. at 510; *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)); *see Wheeler*, 415 F.3d at 405; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253); *accord Hicks*, 509 U.S. at 507-08; *Baker*, 430 F.3d at 753-54; *Wheeler*, 415 F.3d at 405; *Septimus v. University of Houston*, 399 F.3d 601, 609 (5th Cir. 2005); *Laxton*, 333 F.3d at 578; *Crawford*, 234 F.3d at 902; *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000), *cert. denied*, 531 U.S. 1150 (2001).

a.   Unequal Pay

Mills alleges that he received less compensation than "comparables received for the same work." While Mills refers to this claim as one of disparate treatment, it is more specifically categorized as an unequal pay claim. Such claims are cognizable under § 1981. *See Ford v. Horseshoe Entertainment*, 281 F.3d 1279, No. 00-31061, 2001 WL 1692483, at *1 (5th Cir. Nov. 28, 2001) (per curiam). Mills is a member of a protected class, African American, and his compensation was less than that of Foster, his Caucasian predecessor. He cannot rely upon this

claim, however, as a basis for the instant lawsuit because it was settled and dismissed with prejudice in prior litigation. *See Smith v. Amedisys, Inc.*, 298 F.3d 434, 441, 443 (5th Cir. 2002) (holding separation agreement to preclude subsequent discrimination suit); *accord Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (giving effect to a separation agreement to bar federal claims); *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994) (enforcing general post-termination release from liability in employment context); *O'Hare v. Global Natural Res., Inc.*, 898 F.2d 1015, 1016-17 (5th Cir. 1990) (permitting release of federal age discrimination  claims); *Rogers v. General Elec. Co.*, 781 F.2d 452, 454 (5th Cir. 1986) (approving release of Title VII claims that antedate the settlement agreement); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381-82 (1996) (upholding the validity of a state court's confirmation of a settlement and release of federal claims).

Defendants provided the court with a copy of an Order of Non-Suit, signed by Donald J. Floyd, presiding judge of the 172d Judicial District Court of Jefferson County, Texas, dated December 10, 2003, in which the court granted Mills's motion for non-suit with prejudice to the refiling of his claims.  At deposition, Mills acknowledged that the City fulfilled its obligations pursuant to the terms of the underlying settlement and release.  In his response, Mills concedes that he does not seek "additional pecuniary damages [for discrimination] based on the now settled state court action."  Nor does Mills dispute the validity of his prior settlement with the City.  *See Smith*, 298 F.3d at 441.  Thus, to the extent that Mills advances a racial discrimination claim based on unequal pay in his amended complaint, summary judgment is proper in favor of Defendants.

b.      Discriminatory Discharge

Mills further asserts in his amended complaint that Defendants discriminated against him "by taking discriminatory actions designed to terminate Mills's employment, including the abolition of [his] position."  Defendants respond that Mills has failed to establish a *prima facie* case of discriminatory discharge and that he was terminated for legitimate, nondiscriminatory reasons.

(1).     *Prima Facie* Case

To establish a *prima facie* case of discriminatory discharge, a plaintiff may show that:

(1)      he is a member of a protected class;

(2)      he was qualified for the position;

(3)      he was discharged; and

(4)      he was replaced by someone outside the protected class.

*See Wheeler*, 415 F.3d at 405; *Bryan*, 375 F.3d at 360; *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002); *Rios v. Rossotti*, 252 F.3d 375, 377 (5th Cir. 2001); *Pratt*, 247 F.3d at 606 n.2; *Oden v. Oktibbeha County*, 246 F.3d 458, 467 (5th Cir.), *cert. denied*, 534 U.S. 948 (2001); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426 (5th Cir. 2000).  Nevertheless, "it is well settled that, although replacement with a non-member of the protected class is evidence of discriminatory intent, it is not essential to the establishment of a *prima facie* case . . . ."  *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 485 (5th Cir. 2000) (citing *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246-47 (5th Cir. 1985) (stating that "[t]his court has previously held that the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the

discharge was motivated for discriminatory reasons")); *see O'Brien v. Lucas Assocs. Pers., Inc.*, 127 F. App'x 702, 706 (5th Cir.), *cert. denied*, 126 S. Ct. 376 (2005)).

Mills suggests that the EDC Board recommended the hiring of Batiste, also an African American, to undermine his discrimination suit.  His evidence is insufficient, however, to establish an improper motive on the part of Defendants in connection with Mills's termination, as it consists merely of Flood's attenuated recollection that an EDC Board member, perhaps Linda Spears, indicated that the Board recommended Batiste to defeat Mills's lawsuit and Flood's further assertion that Sokolow speculated that this might have been the EDC's intent.  The EDC, however, did not have the authority to hire Batiste directly.  Mills has not presented any evidence that the City Council, the final decision-making body, was motivated by the desire to thwart Mills's discrimination action.  Even assuming that proof that Batiste's hiring was somehow tainted could satisfy the fourth element of a *prima facie* case, Mills has not adduced sufficient evidence to do so.  *See Jones v. Butler Metro. Housing Auth.*, 40 F. App'x 131, 135-36 (6th Cir. 2002). Moreover, Mills does not demonstrate that such an action would create an inference of discrimination in relation to his own termination some nine months before.

In the alternative, a plaintiff may establish a *prima facie* case by demonstrating that he is a member of a protected class, he was qualified for the position, and similarly situated persons outside the class were treated more favorably than he.  *See Wheeler*, 415 F.3d at 405; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005); *Septimus*, 399 F.3d at 609; *Bryan*, 375 F.3d at 360; *Laxton*, 333 F.3d at 579 n.1; *Okoye*, 245 F.3d at 512-13; *Byers*, 209 F.3d at 426-27; *Rutherford v. Harris County*, 197 F.3d 173, 184 (5th Cir. 1999); *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).  To establish a *prima facie* case in this manner,

the plaintiff must show that employees not of his protected class received preferential treatment under circumstances nearly identical to his. *See Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1027 (2006) (citing *Okoye*, 245 F.3d at 514); *Keelan*, 407 F.3d at 345; *Perez v. Texas Dep't of Criminal Justice*, 395 F.3d 206, 210 (5th Cir. 2004), *cert. denied*, 126 S. Ct. 545 (2005) (emphasizing that assessment of similarity of employees must be viewed from employer's perspective); *Aldrup v. Caldera*, 274 F.3d 282, 287 n.23 (5th Cir. 2001); *Methodist Hosp. Sys.*, 271 F.3d at 221; *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001). In other words, Mills must show that a non-African-American employee, who engaged in comparable conduct under similar circumstances, was not terminated. *See Aguinaga v. Texas Alcohol & Beverage Comm'n*, 98 F. App'x 328, 331 (5th Cir. 2004) (holding that plaintiff failed to establish a *prima facie* case of discrimination because he did not provide comparator employees in "nearly identical" circumstances, given their different supervisors, job descriptions, and disciplinary rules).

In the instant case, Mills, an African American, is clearly a member of a protected class, was at least arguably qualified for the position of Executive Director, and was effectively discharged from his position by the City. Thus, Mills can satisfy three of the four elements of a *prima facie* case of discrimination against the City. In his response to Defendants' motion for summary judgment, however, Mills fails to point to any adverse employment action taken against him by the EDC. *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004). Thus, he cannot establish a *prima facie* case of racial discrimination against the EDC.

Moreover, to prevail against the City, because Mills was replaced by an African American, he must also prove that a similarly situated employee engaged in comparable conduct but was not

28

terminated. *See Okoye*, 245 F.3d at 513. Mills, however, has failed to demonstrate that he and Foster, or he and any other City or EDC non-African-American employee, were similarly situated. While it is undisputed that Foster and Mills occupied the same position and performed substantially similar duties, Mills has not adduced any evidence suggesting that Foster experienced any of the same difficulties or demonstrated any of the same shortcomings mentioned in the Botley reports. *See Bryant*, 413 F.3d at 478-79; *Okoye*, 245 F.3d at 514. Because the record is totally devoid of evidence that Foster was accused of similar infractions, the two situations cannot be deemed analogous. *See Bryant*, 413 F.3d at 478-79; *Okoye*, 245 F.3d at 514.

   Mills suggests indirectly that this court should discern the City Council's discriminatory intent from the fact that Ortiz criticized Mills in a public forum, while choosing not to embarrass the EDC's attorney, Jim Wimberly ("Wimberly"), a Caucasian, who was also considered incompetent by Ortiz. The court notes that Defendants permitted Wimberly's contract to lapse instead of taking active steps to terminate his employment. Again, however, Mills has failed to present adequate evidence that Mills's and Wimberly's circumstances were "nearly identical." *See Bryant*, 413 F.3d at 478. Wimberly was employed in a different capacity, and it is uncertain from the existing record how much time he had remaining on his contract compared to Mills. Moreover, though Ortiz admittedly believed him to be incompetent, there is no evidence that his alleged transgressions were as severe, widespread, or repetitious as Mills's. Hence, because Mills has not shown that Wimberly was similarly situated, any comparison between the two provides no basis for relief.

   Accordingly, Mills has not adduced sufficient evidence to establish a *prima facie* case of discriminatory discharge against Defendants. Mills has failed to demonstrate that the EDC

discharged him or took any other adverse employment action against him. *See Pegram*, 361 F.3d at 282. Moreover, he has not shown that he was replaced by a person not of his protected class or that any similarly situated, non-African-American employee was treated more favorably than he by either the City or the EDC. *See Bryant*, 413 F.3d at 478-79. Consequently, summary judgment is warranted on this claim.

(2). <u>Legitimate, Nondiscriminatory Reason</u>

Even if Mills had established a *prima facie* case of racial discrimination, Defendants have set forth an adequate, nondiscriminatory reason for his termination. Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Reeves*, 530 U.S. at 142; *Hicks*, 509 U.S. at 506-07; *Bryant*, 413 F.3d at 475 n.3; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 384; *Sandstad*, 309 F.3d at 897. "The purpose of this step is 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.'" *Stratton v. Department for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir. 1997) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998); *accord Williams*, 98 F.3d at 181; *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993). Hence, the defendant's burden is relatively light. *See Greenway*, 143 F.3d at 52.

"If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quoting *Hicks*, 509 U.S. at 507); *accord Price*, 283 F.3d at 720. "The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979); *see Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). Indeed, even an employer's incorrect belief that "an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). The articulated reason, however, must be both "'clear and reasonably specific.'" *Okoye*, 245 F.3d at 513 (quoting *Burdine*, 450 U.S. at 258); *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994). Furthermore, it "'must be legally sufficient to justify a judgment for the [employer].'" *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998) (quoting *Burdine*, 450 U.S. at 255); *see Patrick*, 394 F.3d at 319 n.34; *Nichols*, 81 F.3d at 41. If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden which has never left him: that of proving that the defendant intentionally discriminated against him." *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir.), *cert. denied*, 522 U.S. 1015 (1997); *accord Reeves*, 530 U.S. at 143; *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385; *Sandstad*, 309 F.3d at 897.

Here, Defendants have set forth a legitimate, nondiscriminatory reason for Mills's termination. Specifically, Defendants point to the Botley reports and Ortiz's testimony as evidence of Mills's purported mismanagement of the EDC. Hence, Defendants have articulated a specific reason for the City Council's decision to eliminate his position, which permits the conclusion that such action was not based on a discriminatory animus, thus satisfying Defendants' burden of production.

(3).   <u>Pretext for Discrimination</u>

Because Defendants have carried their burden of articulating a legitimate, nondiscriminatory reason for their actions, to prevail, Mills "'must provide some evidence, direct or circumstantial, to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination.'" *Rutherford*, 197 F.3d at 184 (quoting *Scott v. University of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998)); *see Reeves*, 530 U.S. at 143; *Hicks*, 509 U.S. at 507-08; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385; *Sandstad*, 309 F.3d at 897. Ultimately, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason" for the employer's decision. *Hicks*, 509 U.S. at 515 (emphasis in original). The plaintiff must be given a "'full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race was." *Id.* at 507-08 (quoting *Burdine*, 450 U.S. at 256). In doing so, "[t]he plaintiff must rebut each nondiscriminatory reason articulated by the employer." *Laxton*, 333 F.3d at 578 (citing *Wallace*, 271 F.3d at 220).

32

While the presumption of discrimination is no longer operative once the employer meets its burden of production, "the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom'" may still be considered "'on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 255 n.10); *see Laxton*, 333 F.3d at 582. Nevertheless, as pointed out above, "discrimination suits still require evidence of discrimination." *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000), *cert. denied*, 532 U.S. 937 (2001); *accord Ratliff v. City of Gainesville*, 256 F.3d 355, 360-61 (5th Cir. 2001). If "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse employment action." *Crawford*, 234 F.3d at 903 (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997)); *see Reeves*, 530 U.S. at 143; *Laxton*, 333 F.3d at 585. "The question for summary judgment is whether a rational fact finder could find that the employer discriminated against the plaintiff on the basis of race." *Pratt*, 247 F.3d at 606 (citing *Hicks*, 509 U.S. at 511).

"[T]he plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price*, 283 F.3d at 720. Hence, the plaintiff's assertion of pretext must be supported by more than mere self-serving, subjective, or speculative allegations; a plaintiff must provide sufficiently specific, substantive reasons for his claim of pretext. *See Nichols*, 81 F.3d at 42; *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 119 (5th Cir. 1993). If the evidence presented is "not so persuasive so as to support an inference that the real reason was discrimination," then the plaintiff has failed to meet his burden. *Rubinstein*, 218 F.3d at 400. "Certainly there will be instances where, although the plaintiff has

established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148; *see West*, 330 F.3d at 385; *Price*, 283 F.3d at 720.

Although his briefing lacks specificity, Mills asserts that the City Council's justification for his termination was pretextual. The only explicit argument that Mills makes regarding pretext concerns the EDC's recommendation of Batiste and the City Council's hiring of Batiste as his *de facto* replacement. Mills contends that the possibility that Batiste was hired to undermine his discrimination suit suggests pretext. Under the circumstances, his position lacks merit. First, the court notes that Mills's immediate, interim replacement was not Batiste, but rather Echols, who is likewise an African American. Mills does not suggest that Echols was assigned to perform his former duties as a preemptive strike against any prospective discrimination suit. Second, even if Defendants were motivated by a desire to thwart a discrimination suit, it does not logically follow that the original decision to terminate Mills was necessarily racially motivated. Third, the City Council, not the EDC Board, terminated Mills's employment. An EDC Board member's supposed desire to reduce Mills's chances of prevailing in this action by recommending Batiste has no relevance to the motivations of the City Council in eliminating Mills's position. Fourth, the City Council's vote to confirm Batiste as CEO of the EDC was unanimous, drawing the support of even those council members who voted against terminating Mills. Fifth, Mills does not argue that Batiste is unqualified for the position of CEO, much less offer any evidence to impugn his credentials. Thus, Defendants' decision to replace Mills with Batiste does not serve as evidence of pretext.

Mills also deems it significant that Council Member Hannah, the sole African American who voted to eliminate Mills's position, had, at the time he cast the dispositive vote against Mills, recently been accused of not residing in his district, an accusation that potentially subjected him to removal from his position on the City Council.   Yet, Mills conceded at deposition that this allegation was never proven and offers nothing in support of its veracity.   Moreover, Mills has proffered no evidence linking the City's failure to strip Hannah of his seat on the City Council with an illicit agreement with Hannah to vote to terminate Mills.   Rampant speculation is no substitute for proof.

Mills also points to allegedly racist remarks as evidence of pretext.  At deposition, Flood and Sinegal testified that Hannah made several racially pejorative remarks concerning African Americans, despite being an African American himself.   Such comments, however, did not specifically concern Mills, the resolution to terminate Mills, or any other matter relevant to this case.  Sinegal recalled hearing Hannah express racially hostile statements at Hannah's place of business, a funeral home.  Flood did not reveal the context in which Hannah allegedly cast racial aspersions upon African Americans.   Nor is there any evidence suggesting that Hannah's purportedly racially derogatory remarks were temporally proximate to the City Council's vote. In this situation, "[s]uch remarks, even if they were made, were 'stray remarks' which were too remote and vague to be probative of [race] discrimination." *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995), *cert. denied*, 516 U.S. 1047 (1996); *accord Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002), *cert. denied*, 537 U.S. 1108 (2003); *Methodist Hosp. Sys.*, 271 F.3d at 222; *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001).  A plaintiff may not "create a fact issue on pretext" by introducing

evidence of "stray remarks not connected to an employment decision." *Keelan*, 407 F.3d at 345-46.

Mills further points out that Ortiz allegedly instructed several different individuals to fire Mills. This assertion, however, does not advance Mills's position that Defendants racially discriminated against him; rather, it merely buttresses the already uncontested fact that Ortiz wished Mills removed as Executive Director. Mills seems to argue that Ortiz's purported racial bias, which is not substantiated by the record, may be discerned from his acknowledged belief that certain African-American council members attempted to "protect" Mills. This assertion is a *non sequitur*—Ortiz's suspicion that several council members opposed Mills's dismissal based on their racial affinity does not logically lead to an inference that Ortiz himself was motivated by discriminatory intent.

Mills presented some evidence suggesting that the concerns with his performance were overstated. Despite Sinegal's deposition testimony that he requested a performance evaluation of Mills, no such evaluation was ever provided to members of the City Council. Flood, Sinegal, and Gillam suggested that the criticism of Mills was not valid. Sinegal speculated that Mills might have performed better without interference from the City Council. He also described Mr. Botley as a "hatchet man," who tailored his audit reports to suit Ortiz's objectives, but Sinegal admitted he had no actual evidence of Mr. Botley's supposed lack of integrity. Likewise, Mills complained that Mr. Botley did not incorporate his accusations of misconduct against Ortiz, Sokolow, and the City Council into the audit report. Mills, however, presented no evidence that Mr. Botley failed to consider these issues and did not explain how such omissions ameliorated the criticisms of his own performance. Moreover, the court notes that the Botley reports in question pertained to the

EDC, not the City government, and they also criticized the City Council's oversight of the EDC. In any event, Mr. Botley did not make the decision to terminate Mills. Thus, the accuracy of his reports, absent evidence that the City Council was somehow complicit, is not indicative of discrimination or pretext. *See Bryant*, 413 F.3d at 477.

Significantly, Mills does not dispute many of the facts underlying Defendants' enumerated complaints about his performance. Mills agreed that the relationship between the EDC and the City Council was contentious at times. He acknowledged at deposition that, despite Ortiz's repeated requests, he declined to bring the Target project before the EDC Board. Mills further conceded that internal audits were not always completed in a timely manner. He also admitted that Botley correctly admonished the EDC for disbursing funds in one instance despite the fact that the contract was not complete. Indeed, Mills concurred with the conclusion of the 2005 Botley report that some recurring problems existed and were not adequately addressed.

In each case of negative performance assessment, Mills claimed to harbor legitimate concerns or tendered excuses. Yet, his attempts at justification do not change the fact that Ortiz and the City Council held him responsible for each shortcoming and oversight. Likewise, Mills's attempts to deflect the criticism contained in the Botley reports onto the City Council and the EDC Board fall wide of the mark. While Mills was not the ultimate authority at the EDC, it is clear from the record that he was a key employee and played a substantial role in its affairs. At the very least, the City Council cannot be faulted for viewing the Botley reports as relevant to evaluating Mills's job performance as the Executive Director of the EDC.

It is well established that the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor . . . to transform the courts into

37

personnel managers." *EEOC v. Louisiana Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995) (citing *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988)); *see Bryant*, 413 F.3d at 478; *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978); *Mato v. Baldauf*, 267 F.3d 444, 452 (5th Cir. 2001), *cert. denied*, 536 U.S. 922 (2002) (noting that the Fifth Circuit "has repeatedly and emphatically stated that anti-discrimination laws 'are not vehicles for judicial second-guessing of business decisions'" (quoting *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999)); *Walton*, 119 F.3d at 372; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 (5th Cir. 1993). "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions . . . .'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)).

Moreover, "[m]erely disputing [the employer's] assessment of [the plaintiff's] work performance will not necessarily support an inference of pretext." *Shackelford*, 190 F.3d at 408; *accord Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001). Hence, an employee cannot survive summary judgment just because he disagrees with the employer's assessment of his performance; the issue is whether the employer's perception of his performance, accurate or not, was the real reason for his termination. *See Bryant*, 413 F.3d at 478; *Evans*, 246 F.3d at 355; *Shackelford*, 190 F.3d at 408. Thus, Mills's contention that his performance was not deficient, even if true, does not necessarily demonstrate pretext. "[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." *Waggoner v. City of Garland*, 987 F.2d 1160, 1165-66 (5th Cir. 1993); *accord Johnson*

*v. Louisiana*, 369 F.3d 826, 832 n.7 (5th Cir. 2004); *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 579 n.4 (5th Cir. 2002); *Singh v. Shoney's, Inc.*, 64 F.3d 217, 219 (5th Cir. 1995).  Mills has adduced no viable evidence suggesting that the City Council acted in bad faith when it eliminated Mills's position or that the decision to terminate Mills was motivated by anything other than a reasonable belief that his performance was deficient.  "In sum, a dispute in the evidence concerning [Mills's] job performance does not provide a sufficient basis for a reasonable factfinder to infer that Defendants' proffered justification is unworthy of credence." *Little*, 924 F.2d at 97.

Regarding Mills's contention that the City Council circumvented the EDC's proper role, the Fifth Circuit has held that an employer's disregard of its own policies and procedures does not, standing alone, conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual.  *See EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996) (citing *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989)); *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1179-80 (5th Cir. 1990).  Assuming *arguendo* that the City Council "acted outside [its] statutory authority," this fact "is not probative with respect to whether [the City Council's] articulated justification is mere pretext." *Auguster*, 249 F.3d at 404.  Although Mills has adduced evidence that Ortiz disliked him, "evidence of mere dislike is not enough to prove pretext under [§ 1981]; [Mills] must present evidence which would support an inference of racial or retaliatory animus in order to meet [his] evidentiary burden under a Title VII discrimination or retaliation claim." *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 143 (5th Cir. 1996).

The court also notes that Ortiz, who introduced the resolution to relieve Mills of his duties, originally voted to approve Mills's appointment as Deputy Director and did not vote against his selection as Executive Director. The Fifth Circuit has held that this situation "gives rise to an inference of non-discrimination" because it is illogical to assume that a decisionmaker would recommend that an employee from a protected group be selected for a position merely to terminate him once he is on the job. *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997). In *Brown v. CSC Logic, Inc.*, the Fifth Circuit specifically approved the "same actor" inference:

> "[C]laims that employer animus exists in termination but not in hiring seem irrational." From the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."

82 F.3d 651, 658 (5th Cir. 1996) (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)); *accord Nieto*, 108 F.3d at 624; *see also Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 570 n.4 (5th Cir. 2003). As in *Brown*, the facts in this case are not "sufficiently egregious to overcome the inference" that Ortiz's stated reason for the City Council's actions is not a pretext for racial discrimination. 82 F.3d at 658.

Mills's own testimony, as well as that of Flood and Sinegal, supports the proposition that Ortiz wished to terminate him, at least in part, due to his defiance of Ortiz's instructions concerning various projects. An employer, however, "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix*, 738 F.2d 1187 (citing *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976)); *see also Texas Instruments, Inc.*, 100 F.3d at 1182; *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 n.19 (5th Cir. 1995); *Risher*, 889 F.2d at 598. "'While an

40

employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.'" *Nix*, 738 F.2d at 1187 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979)).

In the final analysis, Mills's subjective perception of discrimination is all that remains. It is well established, however, that an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See Roberson*, 373 F.3d at 654; *Auguster*, 249 F.3d at 403; *Bauer*, 169 F.3d at 967; *Lawrence v. University of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997); *Nichols*, 81 F.3d at 42; *Douglass*, 79 F.3d at 1430; *Louisiana Office of Cmty. Servs.*, 47 F.3d at 1448. Mills's "bald assertions of [race] discrimination are inadequate to permit a finding that proscribed discrimination motivated" an employer's conduct. *Ray*, 63 F.3d at 435. Moreover, the subjective beliefs of Flood, Sinegal, and Gillam suffer from the same defects as the plaintiff's subjective belief. *See Little*, 924 F.2d at 96; *McConnell v. Thomson Newspapers, Inc.*, 802 F. Supp. 1484, 1504 n.26 (E.D. Tex. 1992). It does not matter "that the belief belongs to a party other than the plaintiff," even if the belief is held by an individual in a position of authority. *See Little*, 924 F.2d at 96. When, as here, Mills does not adduce objective evidence refuting the rational reasons articulated by the employer, pretext cannot be established by subjective beliefs that discrimination motivated the employer's actions. *See Roberson*, 373 F.3d at 654; *Armendariz*, 58 F.3d at 153; *Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983), *cert. denied*, 467 U.S. 1215 (1984).

In this case, Mills has not rebutted Defendants' ample evidence of a legitimate, nondiscriminatory reason for his termination. Thus, Mills, like the plaintiffs in *Crawford* and

*Rubinstein*, has "failed to meet his burden of producing any evidence of discrimination sufficient to survive summary judgment, and his evidence to rebut the non-discriminatory reasons offered by [Defendants] is not so persuasive so as to support an inference that the real reason was discrimination." *Rubinstein*, 218 F.3d at 400; *see Crawford*, 234 F.3d at 904. As a consequence, Mills cannot prevail on his claim of discriminatory discharge, and summary judgment for Defendants is warranted on this alternate basis.

2.    Retaliation

Mills also claims that Defendants violated his rights under § 1981 by retaliating against him for filing a prior racial discrimination lawsuit. Although § 1981 contains no specific retaliation provision, it has been recognized as encompassing allegations of retaliatory conduct in a racial discrimination context. *See Foley*, 355 F.3d at 339. To be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that are protected by § 1981. *See id.*; *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998). "An act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981." *Id.* As Mills's previous state court action concerned purportedly racially discriminatory unequal pay, his current retaliation claim falls within the ambit of § 1981. *See Foley*, 355 F.3d at 339; *Hawkins*, 163 F.3d at 693.

"[R]etaliation claims under § 1981 and Title VII . . . are parallel causes of action. Each requires proof of the same elements in order to establish liability." *Foley*, 355 F.3d at 340 n.8. Where, as here, direct evidence of retaliation is lacking, "[r]etaliation claims under . . . § 1981 are analyzed under the *McDonnell Douglas* burden-shifting scheme." *Mayberry v. Mundy*

42

*Contract Maint., Inc.*, No. 05-20794, 2006 WL 2505308, at *2 (5th Cir. Aug. 30, 2006); *accord Davis*, 383 F.3d at 319; *Foley*, 355 F.3d at 340 n.9. "The framework for analyzing a retaliation claim is the same as that used in the employment discrimination context." *Rios*, 252 F.3d at 380; *accord Patrick*, 394 F.3d at 315 n.10; *Perez*, 307 F.3d at 325; *Aldrup*, 274 F.3d at 286; *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

Therefore, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its actions. *See Baker*, 430 F.3d at 754-55; *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002); *Aldrup*, 274 F.3d at 286; *Rios*, 252 F.3d at 380; *Medina*, 238 F.3d at 684. If the employer meets its burden, the employee may nevertheless prevail by showing that the reasons given by the employer are a pretext for retaliation. *See Septimus*, 399 F.3d at 608; *Gee*, 289 F.3d at 345; *Aldrup*, 274 F.3d at 286; *Rios*, 252 F.3d at 380; *Medina*, 238 F.3d at 684. Under a pretext theory, to carry his ultimate burden, the plaintiff must demonstrate that the adverse employment action would not have occurred "but for" the employee's participation in the protected activity. *See Septimus*, 399 F.3d at 608; *Mato*, 267 F.3d at 450; *Rios*, 252 F.3d at 380; *Evans*, 246 F.3d at 354.

a.    *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show:

(1)    he engaged in statutorily protected activity;

(2)    action was taken by the employer against the plaintiff that a reasonable employee would consider materially adverse; and

(3)    a causal connection exists between the protected activity and the adverse action.

43

*See Davis*, 383 F.3d at 319; *see also Baker*, 430 F.3d at 754; *Roberson*, 373 F.3d at 655; *Zaffuto v. City of Hammond*, 308 F.3d 485, 492 (5th Cir. 2002); *Perez*, 307 F.3d at 325; *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001).

In his response to Defendants' motion, Mills argues that summary judgment is inappropriate because the City Council retaliated against him when it terminated his employment. It is undisputed that Mills engaged in protected activity when he filed suit against the City for racially-motivated unequal pay and that his termination constitutes a materially adverse employment action. Defendants assert, however, that Mills has failed to establish a causal link between his protected conduct and his subsequent loss of employment.

Although the third element of a *prima facie* case—causation—is similar to the ultimate issue in an unlawful retaliation claim, the standard for establishing a causal link at the *prima facie* case stage is much less stringent. *See Ackel v. National Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003); *Gee*, 289 F.3d at 345; *Evans*, 246 F.3d at 354; *Medina*, 238 F.3d at 685; *Long v. Eastfield Coll.*, 88 F.3d 300, 304 n.4 (5th Cir. 1996). As the Fifth Circuit has commented in the Title VII context:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.

*Id.* (emphasis in original). In order to establish the requisite causal link for a *prima facie* case, a plaintiff need not prove that his protected activity was the sole factor in motivating the employer's challenged decision. *See Mauder v. Metropolitan Transit Auth.*, 446 F.3d 574, 583 (5th Cir.), *cert. denied*, 75 U.S.L.W. 3154 (2006) (citation omitted); *Gee*, 289 F.3d at 345;

44

*Evans*, 246 F.3d at 354; *Medina*, 238 F.3d at 684; *Long*, 88 F.3d at 305 n.4.  Rather, a causal

link is established when the evidence demonstrates that the employer's decision to take adverse

action was based in part on knowledge of the employee's protected activity.  *See Ackel*, 339 F.3d

at 385-86 (citing *Medina*, 238 F.3d at 684); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112,

1122 (5th Cir. 1998).  In *Medina*, the Fifth Circuit adopted the Eleventh Circuit's method of

analysis in a similar case, finding that "the 'causal link' element is satisfied when the plaintiff

shows that the employment decision and his protected activity 'were not wholly unrelated.'"  238

F.3d 684 (quoting *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.),

*cert. denied*, 474 U.S. 981 (1985)).

      The consideration of three factors may be helpful in determining whether a causal link has

been demonstrated at the *prima facie* case stage:  (1) the plaintiff's past disciplinary record, (2)

whether the employer followed its typical policies and procedures when taking adverse action

against the employee, and (3) the temporal relationship between the employee's conduct and the

adverse act.  *See Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 507-08 (5th Cir. 1994) (citing

*Jenkins v. Orkin Exterminating Co.*, 646 F. Supp. 1274, 1277 (E.D. Tex. 1986)).  Here, the

Botley audit reports indicate that Mills's performance was deficient over a period of at least three

years.  The enumerated problems, including recurring conflicts between Mills and City officials,

his habitual delinquency in complying with audit requests, and the systemic failure to monitor

projects and payments properly, weigh against inferring a causal link between the City Council's

decision to terminate Mills and his protected activity.

      On the other hand, it is questionable whether the City Council followed its normal

procedures in terminating Mills.  The City Council, as Defendants argue, may have had the legal

authority to eliminate Mills's position, but such ability does not necessarily excuse the purported irregularity of the process. Flood and Sinegal testified that, based on their understanding of the applicable law, the City Council should not have terminated Mills without the recommendation of the EDC Board. Flood elaborated that he witnessed Ortiz admonish Debra Khalajabodi ("Khalajabodi"), an EDC Board member, for previously failing to terminate Mills, as instructed. At deposition, Ortiz acknowledged that the City Council rarely intervened directly in the EDC's affairs. The Articles of Incorporation empower the City Council to appoint and remove directors, with or without cause, but state that "[a]ll powers of the [EDC] shall be vested in a Board [of Directors]." Nevertheless, the Articles of Incorporation do not explicitly restrict the City from intervening in the EDC's affairs.

Although the City Council determined in Resolution No. 05-51 that "an alteration of the structure and organization of the [EDC through elimination of the position of Executive Director] would improve . . . coordination and management," the City Council subsequently chose to create the functionally identical position of CEO. At the same time, because an Executive Director had never been terminated in the past, it is difficult to ascertain what procedures would ordinarily govern such an action. Moreover, the relevant law at the time provided that the City could, "[at] any time . . . [,] in its sole discretion alter the structure organization, programs, or activities of the corporation [by] resolution of the [City]." TEX. REV. CIV. STAT. ANN. art. 5190.6 (Vernon Supp. 2005) (effective Sept. 1, 2003, to Apr. 11, 2005) (current version at TEX. REV. CIV. STAT. ANN. art. 5190.6 (Vernon Supp. 2006)). Thus, at a minimum, the City appears to have possessed explicit statutory authority to eliminate Mills's position. Although Mills argues that representatives of the Texas Attorney General's Office may have cautioned against the action, he

has not presented any admissible, nonhearsay evidence substantiating this assertion.  In any event,

opinions of the Texas Attorney General are advisory in nature and have no binding authority upon

a court's interpretation of the applicable law.  *See Holmes v. Morales*, 924 S.W.2d 920, 924 (Tex.

1996); *DeSoto Wildwood Dev., Inc. v. City of Lewisville*, 184 S.W.3d 814, 821 n.5 (Tex.

App.—Fort Worth 2006, no pet.); *Cavendar v. Houston Distrib. Co.*, 176 S.W.3d 71, 73 n.1

(Tex. App.—Houston [1st Dist.] 2004, pet. denied).

"The timing of the adverse employment action can be a significant, although not

necessarily determinative, factor." *Mayberry*, 55 F.3d at 1092; *accord Evans*, 246 F.3d at 354.

"'Close timing between an employee's protected activity and an adverse action against [him] may

provide the "causal connection" required to make out a prima facie case of retaliation.'" *Id.*

(quoting *Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir.), *cert. denied*, 522

U.S. 948 (1997)); *accord Jones*, 427 F.3d at 995; *Chavez v. City of Arvada*, 88 F.3d 861, 866

(10th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997) (citing *Burrus v. United Tel. Co. of Kan.,

Inc.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071 (1982)).  The temporal

proximity, however, must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268,

273-74 (2001) (citations omitted) (finding a period of twenty months between protected act and

adverse employment action to suggest "no causality at all").

A gap in time of fourteen months between the settlement of Mills's prior suit and his

termination is too long to create an inference of discrimination.  *See Maniccia v. Brown*, 171 F.3d

1364, 1369 (11th Cir. 1999) (fifteen-month period that elapsed between protected activity and

adverse employment action precluded an inference of causation); *Causey v. Balog*, 162 F.3d 795,

803 (4th Cir. 1998) (thirteen-month delay between protected activity and termination too long for

causation to be established); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (the passing of three months between protected activity and purported retaliation too long to support inference of causation); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993) (nine-month gap between protected activity and adverse employment action precluded reasonable inference of causation); *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 682-83 (S.D. Tex. 2001) (thirteen-month interlude between protected activity and failure to rehire insufficient to support a causal link).

On balance, Mills's evidence is insufficient to raise a fact issue as to the existence of a causal link between his protected activity and the City's adverse employment action against him. The timing of the City's action, the evidence of Mills's repeated mistakes as revealed by the Botley audits, and his frequent confrontations with Ortiz concerning business matters militate against Mills's position.  While the City Council's method of eliminating his position could be construed as unnecessarily circuitous, there is no evidence of impropriety concerning the City's action.  Thus, Mills has not established a *prima facie* case of retaliation against the City.

Similarly, Mills has not offered any evidence that the EDC committed a retaliatory act against him.  There is no dispute that the City, not the EDC, terminated his employment.  In his response, Mills does not allege any grounds, other than termination, as the basis for his retaliation claim.  Thus, he has failed to set forth a *prima facie* case of retaliation against Defendants, and they are entitled to summary judgment on this claim.

b.      Legitimate, Nonretaliatory Reason

Moreover, even if Mills had presented a *prima facie* case, Defendants have adduced ample evidence of a non-retaliatory reason for Mills's discharge.  *See Hockman*, 407 F.3d at 330; *Hunt*

48

*v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir 2001); *Medina*, 238 F.3d at 684

(citing *Long*, 88 F.3d at 305); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992).

As detailed above, Defendants argue that the City Council's decision to eliminate Mills's position

was motivated by its perception of his incompetence rather than any desire to retaliate against him

for his protected activity.  Mills responds that Defendants' legitimate, nonretaliatory reason for

the City Council's action constitutes a pretext to conceal prohibited retaliation.

c.    <u>Pretext for Retaliation</u>

The final inquiry, therefore, is whether the proffered reasons for the alleged acts of

retaliation are merely pretextual.  *See Rios*, 252 F.3d at 380; *Sherrod*, 132 F.3d at 1122.  "If the

plaintiff presents evidence supporting the prima facie case, plus evidence that the reasons given

by the employer for the adverse employment action were pretextual, a jury may infer the existence

of retaliation."  *Mota*, 261 F.3d at 519 (citing *Reeves*, 530 U.S. at 148); *accord Kanida v. Gulf

Coast Med. Pers. LP*, 363 F.3d 568, 573 (5th Cir. 2004); *Pineda v. United Parcel Serv., Inc.*,

360 F.3d 483, 487 (5th Cir. 2004) (citing *Swanson*, 110 F.3d at 1185).  Evidence that raises only

a weak inference of pretext, however, is insufficient to create a genuine issue of material fact in

the retaliation context.  *See Rios*, 252 F.3d at 381.  The ultimate burden of persuading the trier

of fact that the defendant unlawfully retaliated against the plaintiff for engaging in protected

activity remains at all times with the plaintiff.  *See Gee*, 289 F.3d at 348; *Sherrod*, 132 F.3d at

1122; *see also Rios*, 252 F.3d at 380.

In his response, Mills does not identify the basis for his belief that Defendants' legitimate,

nonretaliatory reason for his termination was a pretext for illegal retaliation.  As explained above

in connection with his discrimination claim, Mills has not adduced sufficient evidence of pretext

49

underlying his termination.  Mills points to no testimony or other evidence from which it could be inferred that Defendants eliminated his position because he previously engaged in protected conduct.  While Mills intimated in his response that the City Council's decision to settle his original discrimination action was controversial, there is no indication that the prior lawsuit has any bearing on the instant dispute.  In fact, rather than terminate Mills after he brought suit, the City Council ultimately approved the settlement, which continued his employment, raised his pay grade, and awarded him back pay and attorney's fees.

It is revealing that, when prompted at deposition to explain why he believed he was the victim of unlawful retaliation, Mills stated, "My belief is that I wouldn't do what he wanted done; and, as I explained to him regarding . . . the Target project, that I was not going to do anything illegal."  Mills went on to detail other instances in which he experienced negative interactions with Ortiz and other City officials.  None of these incidents, however, suggests that Mills was retaliated against because of his protected activity of filing suit alleging racial discrimination.  While, taking Mills's allegations as true, he may have been the target of criticism for opposing Ortiz's preferred projects, the record evidence does not reveal illegal retaliation under § 1981.  *See Grimes*, 102 F.3d at 143.

Mills also implies that his allegation that "the City clearly did not honor [its] contract with Plaintiff Mills" for future employment supports an inference of pretext and/or retaliation.  Mills, however, has not demonstrated that the contractual clause that extended his employment by the City should the "funding agreement be terminated" was a term of his employment beyond October 1, 1998.  If the clause was not part of future agreements, then the City could not have violated it.  Moreover, Mills has not adduced any evidence linking the City's purported failure to abide by the

50

agreement to actionable retaliation. *See* 42 U.S.C. § 2000e(a); *Baker*, 430 F.3d at 754; *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372-73 (5th Cir. 1998), *cert. denied*, 525 U.S. 1068 (1999); *Martinez v. Bohls Bearing Equip. Co.*, 361 F. Supp. 2d 608, 616-17 (W.D. Tex. 2005).

Under these circumstances, Mills has failed to demonstrate that Defendants' proffered rationale for his termination is pretextual. He has adduced no viable evidence that the articulated reasons for his discharge are false or that a causal link exists between his termination and his prior lawsuit. Mills also has not adequately rebutted the evidence proffered by Defendants indicating that his performance—particularly his repeated failure to comply with audit requests and reporting requirements—was unsatisfactory. In view of the numerous documented deficiencies, it cannot be said that "but for" his complaints of employment discrimination, Mills would have remained in his position of Executive Director of the EDC. Thus, Defendants are entitled to summary judgment on Mills's retaliation claim.

III.   Conclusion

Accordingly, Defendants' motion for summary judgment is granted. Mills cannot establish a *prima facie* case of racial discrimination. Moreover, he has not demonstrated that the EDC played a role in his termination or that the City's legitimate, nondiscriminatory reason for the elimination of his position was a pretext for discrimination. Similarly, no genuine issues of material fact exist with regard to Mills's retaliation claim, as he did not set forth a *prima facie* case of retaliation against Defendants and failed to rebut the City's legitimate, nonretaliatory reason for

51

his discharge.  Accordingly, Defendants' motion for summary judgment is granted.  Mills fails

to present a claim that merits relief.  Thus, Defendants are entitled to judgment as a matter of law.

SIGNED at Beaumont, Texas, this 4th day of December, 2006.

_____

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE